GLADNEY, Judge.
This action by Robert Holder seeks recovery of damages for the death of Louise Ervin Holder, Wilson M. Holder and Pamela Holder, the mother, father and sister respectively of the petitioner. Made defendants are Wheeling Pipe Line, Inc., Isaac Norrell, The Travelers Insurance Company, and Aetna Casualty & Surety Company.
*294 This appeal is one of three cases consolidated for the purpose of trial. These actions arose as a result of an automobile accident which occurred on December 10, 1960, in Lincoln Parish, Louisiana, when a tractor-trailer combination owned by the Wheeling Pipe Line, Inc. collided with a Pontiac sedan automobile driven by Mrs. Louise Ervin Holder, and occupied by four additional passengers, — Mr. Wilson M. Holder, Pamela Holder, Mrs. Estelle Boy-kin Marshall and Mrs. Lena S. Holder. As a result of the collision all of the occupants of the Holder vehicle were killed, none of them ever having regained consciousness enough prior to their deaths to describe in any manner the accident. The case was tried on its merits September 24-27, 1962. Judgment was rendered on April 11, 1963, and after a motion for a new trial was overruled, judgment was signed on May 31, 1963. The decree rejected plaintiffs’ demands and they have appealed.
The trial.judge rendered written reasons for judgment which we find accord a complete and accurate discussion of the facts of the case upon which the decision turns. As pointed out in the opinion of the district court none of the occupants of the Holder automobile was ever able to give an account of the accident. The only witnesses who were in a position to see the occurrence of the two vehicles contacting each other were Isaac T. Norrell, the driver of the trailer-vehicle, and Walter Savage, Jr., a resident of Ruston, Louisiana, who was following the Wheeling vehicle at a distance of approximately one hundred fifty yards. In its final analysis liability in the case rests upon the determination of which of the two vehicles was outside of its traffic lane at the moment of impact. The plaintiffs in these cases contend that the Wheeling vehicle skidded or jackknifed into the eastbound side of the highway, obstructing said lane and causing the collision with the Holder vehicle. Contrariwise, the defendants contend the Wheeling vehicle was traveling in its proper lane when the Holder vehicle for some unaccountable reason, skidded and traveled over into the westbound or inner lane of the curve of said highway between the back wheels of the trailer-tractor and the back wheels of the trailer of the Wheeling vehicle. These points are explained in comprehensive detail by the learned trial judge in his opinion, from which, with minor exceptions, we quote his full opinion with approval:
“The collision took place at about 11:30 A.M. on the morning of December 10, 1960 on U.S. Highway 80 in the curve at the eastern entry to the overpass where said Highway 80 crosses the Illinois Central Railroad and which overpass is near the western boundary of the Parish of Lincoln. On the date of the accident it had been raining and the roadway was wet. A light rain was falling at the time of the accident. The overpass where the accident occurred is located two or three miles east of the Town of Arcadia. One traveling Highway 80 from east to west would travel along the south side of the railroad until he reached the overpass. Then one would make a 90 degree curve up and over the railroad and then make another 90 degree curve back to the west, in the manner of a backward ‘S’, to resume his direction westward, now along the north side of said railroad.
"On the date in question the driver of the Wheeling vehicle was traveling west along Highway 80 intending to return to his employer’s terminal which was located just over the said overpass and some two hundred yards from the point where the collision took place. The Holder vehicle, occupied by the five persons who were killed, was proceeding in an easterly direction and the driver of this vehicle had completed the westernmost portion of the curve, had crossed over the railroad track and had entered the easternmost curve of said overpass as it came to meet the Wheeling vehicle and it was in this curve that the two vehicles collided and the accident occurred. As a result of the collision, the Wheeling vehicle was turned over on its left side with the rear of the trailer extending out onto the outside shoulder of said highway and with *295 the front bumper thereof extending a short distance into the westbound lane of said highway. The Holder vehicle, on the other hand, came to rest in the eastbound lane of said highway, but facing back in the opposite or westerly direction. The position of both vehicles is well shown by photographs taken at the scene of the accident and which have been enlarged and which are filled in and made a part of this record.
“It is the contention of the plaintiffs in these cases that the driver of the Wheeling vehicle entered the easternmost curve of said overpass at an unsafe speed; that the force exerted outward because of the speed of the vehicle and the existence of the curve became greater than the forces represented in the banked or superelevated portion of the highway and the friction between the tires thereof and the road, causing the trailer portion of the Wheeling vehicle to skid or jackknife into the eastbound lane of the highway, obstructing said lane and causing the collision with the Holder vehicle which resulted in the death of the five parties above named.
“On the other hand, the defendants contend that the Wheeling vehicle did not exceed the safe speed limit for negotiating said curve; that said vehicle never entered the eastbound or outer lane of the highway prior to the collision, but that, for some reason, the driver of the Holder vehicle allowed the same to cut sharply into and under the trailer of the Wheeling vehicle, which brought about the collision and the death of the parties.
“Simply stated, the issue on the merits of this case is whether or not the trailer portion of the Wheeling vehicle skidded into the eastbound or outer lane of that highway and into the oncoming Holder vehicle, thus causing the collision, or whether the Holder vehicle traveled over into the westbound or inner lane of said highway between the back wheels of the tractor and the back wheels of the trailer of the Wheeling vehicle so as to bring about the collision involved in this case. There is no doubt but that the Wheeling vehicle went over into and across the eastbound lane for it came to rest across said lane, but the question to be answered by the Court in the decision on the merits in this case is whether or not it entered the eastbound lane and caused the collision or whether it entered the eastbound lane as a result of the collision. The whole case rests upon our ability to answer this most serious and important question.
“In support of the plaintiffs’ contention, they rely almost entirely upon the testimony of Dr. William H. Tonn, Jr., a consulting engineer and expert in analyzing automobile accidents, of Houston, Texas, and on the testimony of Dr. H. E. Ruff, head of the Physics Department at Louisiana Tech for many years and a highly qualified expert in the field of physics. Through the testimony of these two experts, who have related their opinion in the case to the physical facts established herein, these plaintiffs seek to prove that the accident took place in the eastbound lane of the highway and was, therefore, the fault of the driver of the Wheeling vehicle. On the other hand, the defendants rely on the testimony of the driver of the Wheeling vehicle, Mr. Isaac Norrell, who is the sole surviving participant in the accident; and on the testimony of the investigating officer, State Trooper J. B. Thompson, who investigated the accident and reported the same; and on the testimony of Mr. Walter Savage, a disinterested witness who was following at a short distance behind the Wheeling vehicle as it entered the curve to said overpass and who claims to have seen the Wheeling vehicle at the moment of collision and saw the resulting overturning of same.
“This Court has studied long and intensely the testimony given in the trial of this case and it has reviewed again and again the large number of exhibits that have been filed in evidence herein. Admittedly, there are strong arguments and theories to support each of the contentions and this is one of those cases in which we must be careful *296 to reach our conclusion based solely upon the law and the evidence and not, in any degree, upon our feeling of anxiety because of the loss of the lives of five people or upon mere probabilities or possibilities in this case. We are dealing with one of the most serious accidents that has come to the attention of the Court during the occupancy of the bench by the writer of this opinion.
“In fairness to all of the parties involved in this matter, it is believed well that we give and outline some of the facts, that lend support to the contention of the plaintiffs. We recognize, of course, that these findings do not include all of the facts that might support their contention, but the hereinafter related facts do, to some extent, support the plaintiffs’ contention:
“(1) The evidence establishes that this was and is a dangerous overpass and a dangerous curve in Highway 80. Deputy George Simonton, a deputy sheriff of Lincoln Parish, testified that he knew of five other cases where vehicles traveling in a westerly direction into this same curve turned over in a fashion similar to that of the Wheeling vehicle. This would, of course, lend some support to the theory of the plaintiffs that the Wheeling vehicle was turning over or skidding into the eastbound lane at the time of its collision with the Holder vehicle.
“(2) Admittedly, the normal skidding direction of both vehicles, occasioned by the application of centrifugal force outward from the curve, would he toward the outside of this curve and the skidding, if any took place, would normally be toward the outside of the curve. Therefore, if the Wheeling vehicle or any part thereof skidded in making this ninety degree curve, its direction of skid would be toward the eastbound lane and into or in the direction of the passing Holder vehicle. Likewise, there could be no doubt but that the normal direction that the Holder vehicle would skid would be toward the outside or shoulder of the road in obedience to Newton’s first law of motion.
“(3) There are at least two factors which keep vehicles which are negotiating the circular motion around a curve on the curve and which keep it from following the outward force toward the outside of the curve. The first is the banking or superelevation of the highway itself, and the second is the friction between the tires of the vehicle and the surface of the road. Thus, if the speed of the Wheeling vehicle exceeded the speed at which the counter forces of these two factors were overcome by the centrifugal force which seeks to have the vehicle follow Newton’s first law of motion, then the vehicle would skid toward the outer or eastbound lane of said highway.
“(4) The evidence appears to establish that most of the debris resulting from the collision between the two vehicles was found to be in the eastbound or outer lane of said highway, although some debris, including glass, a spare tire, a fire extinguisher and probably other items of debris were found in the westbound or inner lane of said highway. In this connection it might be observed that when two vehicles, one weighing approximately thirty-two thousand pounds and the other four thousand pounds, collide and both are in circular motion around a curve, then the same force that would tend to cause the vehicle itself to skid into the outer lane might also cause the debris that fell off of such vehicle to skid or to come to rest in the outer lane.
“(5) The evidence shows that the steering wheel of the Holder vehicle appeared to have been locked into position by the force of the collision. Also it showed that the two front wheels of the Holder vehicle were locked in a set position by virtue of the collision. Except for the fact that one of the front wheels of the Holder vehicle was set slightly to its left, both of the wheels were locked in a straight ahead position. Thus, it is claimed by the plaintiff that the Holder car could not have cut or been pulled or guided to the vehicle’s left and under the trailer portion of the Wheeling vehicle.
*297 "(6) The evidence seems to indicate that,by some means, the Holder vehicle got so far under the trailer portion of the Wheeling vehicle that the trailer’s four right rear wheels or tires struck the left front part of the Holder car and then rolled up and over the left front part of the motor and frame, which brought about the overturning of the trailer toward the outside of the curve. The experts believe that at a passing speed of fifty miles per hour (or seventy-three feet per second) there would not have been time for the Holder vehicle to enter the space of about twenty-five feet between the rear wheels of the tractor and the back wheels of the trailer and to be damaged in the way that it was damaged. This supposes that each of the vehicles was making twenty-five miles per hour or a passing speed of fifty miles per hour. No testimony was offered to show what the situation might have been if the Wheeling vehicle was making twenty-five miles per hour as testified by Mr. Norrell, and the Holder vehicle was traveling at a faster speed as he seemed to indicate.
“(7) It is argued that there is no way that the Wheeling vehicle could have swung out across the left or outer lane of said curve, except by its own motion, for the force of the collision was in the other direction. Thus, it is contended that the speed of the Wheeling vehicle must have exceeded twenty-five miles per hour to have traveled about forty feet or more after the collision.
“Likewise, there are a number of facts which tend to support the contention of the defendants in this case and the Court here, without attempting to. enumerate all of such facts, desires to list some of those facts which it believes tend to support the contention of the defendants.
“(1) Mr. Norrell, the driver of the Wheeling vehicle, was an experienced truckdriver. He had arrived back to within two hundred yards of his terminal station and destination. He was well acquainted with the conditions of the curve and knew its dangers. There is no-reason, under such circumstances, for this driver to have been traveling at any great speed, first, because he was to reach his destination within two or three minutes and, second, he knew the safe way in which to execute this curve from having long experience in negotiating it.
“(2) Trooper J. B. Thompson has been with the Louisiana Highway Police for many years and is an expert in automobile accidents. He was the only man or the only officer who went to the scene of the accident within a few minutes after it took place with the responsibility of investigating the cause of the accident and making his official report as to his findings with reference thereto. This Court has known Trooper Thompson for many years and does not believe that he would report any fact except for the purpose of showing the truth of the situation and not by any means to favor one side or the other in this case. Mr. Thompson testified that he found and measured a large fresh gouge mark some three and a half feet over into the westbound lane of the highway at the point of the accident. This fresh gouge mark was-measured from the yellow line drawn along the center of the highway and it was his-opinion that this fixed the point of collisiom between the two vehicles. Furthermore', Mr. Thompson testified that there was visible when he made his examination, a mark on the highway running from this gouge mark three and a half feet into the westbound lane and in a circular motion or direction from that point to the front of the Holder vehicle, which indicates that the Holder vehicle was at least three and a half feet over into the lane of the Wheeling vehicle.
“(3) Mr. Norrell, the driver of the Wheeling vehicle, testified that he saw the Holder-vehicle execute a skidding motion wherein-the rear of said vehicle skidded slightly toward the center line of the highway, some-five to ten feet before the Holder vehicle began to pass the Wheeling vehicle.. Pie testified that he was able to see in his- rear *298 view mirror located outside and on the left side of the cab of his vehicle the Holder vehicle as it swerved directly toward the center of the road in a lefthand direction under his trailer and he was able to observe the Holder vehicle as it began its motion -in and under the tank atop the Wheeling vehicle. This seems to indicate that there was at least a partial loss of control on the .part of the driver of the Holder vehicle and ■it is reasonable to assume that in an attempt to recover from this situation and to remain -on the highway itself, that the driver of the car was able to direct the front of her car back in the direction of the Wheeling vehicle in such a manner as to cause it to run under the trailer of said Wheeling vehicle.
“(4) The testimony shows that a driver of such a tractor-trailer combination as was being used in this case, is able always to know when there is any skidding or jackknifing by the trailer portion of such vehicle. Mr. Norrell testified that such knowledge immediately comes to the driver for he can feel the skidding or jackknifing operation immediately in the steering wheel of the vehicle. He testified positively in this case that no such skidding or jackknifing operation took place.
“(5) The driver of the Wheeling vehicle testified that the Holder car ran under the trailer and that the trailer’s rear wheels struck the Holder vehicle in such a manner that* the rear of the Wheeling trailer was lifted up and ran over the front of the Holder vehicle in such a manner as to result in turning the same over toward the outside of the curve and that the turning over of the tank and trailer effected a complete turning over of the entire Wheeling vehicle, bringing the vehicle to rest as indicated in the photographs.
"(6) The driver of the Wheeling vehicle testified and his testimony is not contradicted that he was traveling at only a speed of about twenty to twenty-five miles per hour and that the Holder vehicle was going much faster. This fact seems to be fairly well verified by the testimony of Mr. Walter Savage • and by the fact that the slow speed of the Wheeling vehicle had resulted in a long line of cars being trapped behind the same for quite a distance, but that ail of said vehicles had managed to pass it with the exception of a small American made car which traveled immediately behind it and the car of Mr. Walter Savage which was traveling from a hundred to a hundred and fifty yards behind the same at the time of the accident.
“(7) Although the Court has the greatest regard for the qualifications of Dr. Tonn and does not doubt his ability as an expert, yet his testimony shows that he was employed by the plaintiffs to investigate and make his report after this accident and did not go to the scene thereof until May of 1962. His testimony was based principally upon his observation of photographs, surveys, plats, the Holder vehicle and other matters related to> the accident. The Court believes that the testimony of this witness, although it sounds very convincing in argument, it can be taken as, at best, an educated speculation.
“(8) The Court does not doubt and it is admitted that the laws of motion as defined by Dr. Ruff are absolute, fixed, and that the same operated throughout the accident involved in this case. Yet, in a motor vehicle collision there comes into operation so many forces and counter-forces applied in so many different directions, until it appears to the Court to amount to pure scientific speculation for us to seek to conclude that the accident was fully and entirely the result of the negligence of the driver of the Wheeling vehicle in opposition to those who testify otherwise, for after the course of the collision begins, the forces that come into play may be so varied and complex as to make it impossible for us to determine how the accident took place. The Court has no doubt but that Newton’s laws of motion were in operation and that they were completely obeyed, but we cannot believe that this would enable us to say with the degree of certainty required by the law *299 that the Wheeling vehicle skidded over into the Holder vehicle, bringing about the collision.
“(9) The highway at the point of the curve was banked or superelevated to compensate for the centrifugal or to the outside force exerted by the vehicles making or rounding the curve. That banking or superelevation effect would conteract the outward force exerted by the vehicles up to a speed estimated at twenty-five miles per hour, without the need of the added force of friction, and by the use of the added force that friction might assert into the center, the speed might exceed twenty-five miles per hour. At the point of the collision the defendant’s vehicle was not only proceeding around the curve, but it was also proceeding up a rather steep incline approaching the overpass across the railroad track. Since the force exerted in making a circular motion around the curve would be outward and at a tangent to the circle (or in accordance with Newton’s first law of motion, would seek to continue in a straight line) such force might also be additionally retarded by the slope of the upward curve into the actual overpass. Thus, it seems that there would be, as far as the Wheeling vehicle is concerned, three rather than two into the center forces set in opposition to the centrifugal force then being asserted toward the outer portion of the highway, and that is the superelevation of the road, the friction between tires and road and the incline upward into which the Wheeling vehicle as, at the moment, proceeding. Conversely, these into the center forces which operated against the Wheeling vehicle would operate in favor of the Holder vehicle, being directed toward the inside of the circle, or as to the Holder vehicle, the superelevation of the road and the downgrade of the curve in which that vehicle was traveling, would lend themselves toward its ability to travel toward the inside of the curve, and toward the Wheeling vehicle.
“(10) If the trailer portion of the Wheeling vehicle skidded into the outer lane or eastbound lane, thereby colliding with the Holder vehicle, it seems rather improbable to the Court that there would not have been some skid marks on the highway itself visible to the State Trooper who examined the same within a few minutes after the accident took place and who was looking for such marks.
“There are, of course, other facts and factors which might be cited by the Court to support and substantiate the theories of each of the sides in this case and as the Court stated above, the above enumerated! facts which support the theory of the plaintiffs and the enumerated facts which may. lend some support to the theory or the testimony of the defendants do not purport to cover all areas, but are listed principally to show the difficulty that we have in trying to reach a legal conclusion as to the-place of responsibility for the tragic accident which took place on December 10;, 1960.
“We have reviewed very carefully the transcript of the testimony of Dr. William H. Tonn, Jr. and confess that Dr. Tonn makes a fairly strong case on behalf of the plaintiffs. He may be entirely right in his theories as to how the accident took place and in pointing to the fault that brought it on. But Courts are required to decide cases because the evidence establishes a defendant’s responsibility to a legal certainty and we are not satisfied here to use the theories of accident experts to decide this-case when the same are adverse to the-sworn and uncontradicted testimony of witnesses who present a positive statement of observed facts.
“In this case Dr. Tonn was employed by the plaintiffs to investigate and to analyze-this wreck. In that connection- he examined the Holder car; he examined the curve where the wreck took place; he examined surveys and aerial photographs of the scene of the accident; he examined and had available specifications as -to the Wheeling vehicle consisting of the tractor-trailer combination; he viewed the *300 many photographs that were taken of not only the vehicle but of the road and the •curve involved. We believe it correct to state that from his examination of all of these matters he reached the conclusion .and stated as his opinion, in effect, that the Wheeling vehicle entered the curve •approaching the overpass at a speed in excess of the safe speed limit for which said «curve was designed; that the trailer skidded across into the eastbound lane in front of the Holder vehicle; that the Holder vehicle, as a result, ran under it, and the trailer wheels went up over the car, turning it over. He testified that in his opinion the Holder vehicle, as a result of the collision, rotated and passed under the trailer and that both the Holder vehicle and the Wheeling vehicle came to rest in the eastbound lane of the highway as indicated in the photographs. It was his opinion that it would not be possible for tire car to run under the trailer at a passing speed of fifty miles or twenty-five miles per hour for each vehicle.
“Likewise, Dr. H. E. Ruff, who is a professor of physics at Louisiana Tech, is eminently qualified to testify in the field of physics. In his testimony he recited Newton’s first; second and third laws of motion and after reviewing his testimony, his conclusion seems to be that it was highly improbable that the Holder vehicle moved over into the inside lane adverse to Newton’s first law of motion. He believed also that it would be almost impossible for a car to run between the wheels of the tractor and the wheels of the trailer of the Wheeling vehicle at a passing speed of fifty miles per hour. He likewise believes that the distance the truck traveled after its impact with the Holder vehicle indicated to him that the Wheeling vehicle was traveling at more than twenty-five miles per hour. (He fails to recognize, apparently, that the Wheeling vehicle was utilizing the power of its own motor and that this power may have continued to be applied until the back wheels of the tractor turned over or until the reaction time had elapsed for the driver of the Wheeling vehicle to cut off the power of said motor.)..
“Dr. Ruff likened the motion of a vehicle such as the Wheeling vehicle in negotiating a curve to the game of Top the Whip’, and states that the reason for there being more force applied to the last man in the game of Top the Whip’ than to the first, is that the individual travels in a wider circle, and had farther to travel than the man who headed the group forming the operation known as Top the Whip’. This Court does not believe that the motion of a vehicle such as the Wheeling vehicle in rounding a curve such as existed where this accident took, place, is similar to the game of Top the Whip’ and it is not altogether reasonable to believe that there would be more pressure outward on the rear portion of the trailer of the Wheeling vehicle than there would be on the center or front portion of said vehicle for all portions of that vehicle, that is, the front, the middle and the rear are traveling on the same circle or circumference and at the same speed and the trailer does not normally pass or travel further tiran the motor of the vehicle. In fact, the testimony is that normally the rear trailer wheels of such a vehicle would travel several feet closer inside the curve than would the front or motor part of the vehicle. Consequently, under the theory there would be more outward pressure exerted by the front portion of the vehicle than by the rear for the front part of the vehicle would travel at a greater circumference and a greater distance.
“Dr. Ruff was not called as an automobile accident expert and did not purport to be an expert in the determination of the cause of the accident. His purpose, as a witness, was simply to relate the laws of motion and he did that excellently and in detail. This Court has the greatest respect and admiration for the ability of Dr. Ruff as head of the physics department at Louisiana Tech and recognizes him to be an authority in his field. Yet, when it comes to the great decision or determina *301 tion as to how an accident took place, and what forces and counter-forces and the directions and operations that they had as the course of the accident developed and in the twinkling of an eye was completed is beyond the ability of an expert, to stipulate with any degree of exactness; at least this is so where two vehicles collide and the glancing motion where there is not only the centrifugal force tending to have the vehicles to fly off from the center of the circle toward the circumference and the centripetal force which tends to counteract and overbalance the centrifugal force and thereby cause the vehicle to remain in the curve and on the curve, all of which demonstrates, in the belief of the Court, that the collision in this case, being a glancing collision and involving a very heavy vehicle and a very light vehicle, would bring about such forces as to make it impossible for even an expert to trace and to determine with legal certainty the fault for the collision.
“Adverse to the expert opinion freely given by these two eminent gentlemen, Dr. Tonn and Dr. Ruff, is the positive testimony of certain witnesses who support the contention of the defendants, is the testimony of Mr. Isaac Norrell, the employee of Wheeling Pipe Line Company, Inc., and who was the driver of the Wheeling vehicle that was involved in the accident. This witness states positively that he was not speeding and entered this curve at not more than twenty-five miles an hour, which is a safe speed for said curve, even without the aid of friction. According to the highway engineers, twenty-five miles per hour is safe simply by virtue of the force of the superelevation without need for the additional force supplied by friction. He testified that the Wheeling vehicle did not, at any time prior to the collision, enter into the left or outside lane of said highway. Mr. Norrell swears positively that the trailer connected to the tractor he was driving did not skid or jackknife into the left or eastbound lane of said highway, but that his truck, until the actual collision, always remained well within the westbound lane. This witness testified that the Holder vehicle had a momentary skidding motion by its rear wheels just prior to beginning its passing motion by the Wheeling vehicle. This indicated to the Court that there was an evident temporary loss of control of the Holder vehicle by its driver and it is probable that in the course of recovery of said skidding operation and by aid of the bank or superelevated highway and by the aid of the friction on the Holder tires on the highway, and with the aid of the downhill direction of the curve which the Holder vehicle was traversing, the vehicle came to be traveling toward the center of the highway and in toward the Wheeling vehicle. Mr. Norrell further testified that he did actually see by aid of the mirror on his vehicle the action of the Holder vehicle as it headed in and under his trailer and as a result of its running under the Wheeling vehicles between the wheels of the tractor and the wheels of tire trailer, the right rear wheels of the trailer ran upon the automobile and lifted the tank into the air in such a position as to cause it to turn over and come to rest in the position indicated in the photographs. The Court could see no evidence of any attempt by this witness to give false testimony, but he appeared to be testifying according to the best of his ability in an effort to give to the Court the true facts.
“In addition to the testimony of Mr. Nor-rell, there is the very strong corroborating testimony of Trooper J. B. Thompson. Mr. Thompson, a long time trooper with the Louisiana State Police and an expert in examining and reporting automobile accidents, testified very forcefully that in connection with his examination of the scene of the accident and his report thereon, he found a fresh gouge mark in the surface of the highway located three and a half feet into the westbound lane. In addition to this statement, Mr. Thompson testified that there was evidence of a scratch mark or skidding mark that ran in a circular motion from the point of this fresh gash *302 in the surface of the highway to the front of the Holder automobile. Thus, according to Mr. Thompson’s understanding of this physical evidence, the Holder vehicle was struck at least while it was three and a half feet within the lane being used by the Wheeling vehicle or the westbound lane. Some effort was made to lead the Court to believe that this gouge mark was made either by the spare tire or the fire extinguisher which came from underneath the Wheeling vehicle and were found along the rail on the inside of the curve, but the Court does not believe that the mark was made by either of these instruments, for neither would necessarily have made this particular type or kind of gouge mark. It is believed that this indicates the point of impact, and we reach this conclusion because Trooper Thompson believed it to be the point of impact and because of a mark that indicated or ran from this place to the front of the Holder vehicle. In addition Mr. Thompson also testified that there was considerable glass and debris on that side of the highway, that is, within the westbound lane. Admittedly, the majority of the debris was in the other lane and after the accident by virtue principally of the fact that both vehicles were in the eastbound lane, traffic could traverse and travel through the westbound lane within a short time after the accident.
“There was one other witness whose testimony supports and corroborates the positive testimony of Mr. Norrell and Mr. Thompson and that is the testimony of Mr. Walter Savage, a resident of Ruston and a party who is disinterested in the outcome of this case. He testified that he was traveling some one hundred to a hundred and fifty yards behind the Wheeling vehicle at the time the said vehicle entered the curve at this overpass. He said that there was a small American made vehicle between him and the Wheeling vehicle, but nobody on either side in this case knows who was occupying said automobile and such party or parties could not be reached as witnesses in the case. But Mr. Savage saw the Wheeling vehicle at the moment of its collision. He testifies that said vehicle was not traveling at any excessive rate of speed. He testifies that it entered the curve in its proper lane and that he had not seen the same ever enter into the other lane. At the point of collision, it was his testimony that the trailer of the Wheeling vehicle ran up on the Holder vehicle in such a way as to lift it high in the air and to cause it to turn over to its left into the position where the photographs show it to have been. Likewise, he was able to see that the Holder vehicle spun around and came to rest in the eastbound lane, but facing west. Some effort was made to discount the testimony of Mr. Savage because of the distance that he was from the accident at the time it took place and by the fact that the curve into which the Wheeling vehicle had entered had guardrails constructed along the shoulder so as to obstruct the view of Mr. Savage. However, the photographs will show that there is an area underneath the guardrail through which one may be able to observe the lower portion of a vehicle traveling around this curve from the point where Mr. Savage was located, and, certainly, a tall vehicle such as this tractor-trailer combination with a petroleum carrying tank on top, one would be able to see practically all of same over and above the height of the guardrail. It might be noted that this vehicle was rather tall; that, therefore, its center of gravity was much higher than the point of contact between it and the Holder vehicle, which would normally be a force that would trigger an overturning operation by such a vehicle toward the left side of the highway.
“As we stated in the very beginning of this case, it is one that has given this Court great concern. We have attempted with full diligence to fully study and review all of the evidence, all of the exhibits and to seek to the best of our ability to determine the truth involved. It is always a tragic thing when any person loses his life in an automobile accident and it becomes *303 even more tragic when there’s an accident in which the lives of five people are taken as was done in this case. Yet, we are Courts of Law, and Courts of Law, if they are to he worthy of the name Courts, must always, regardless of the persons or the matters involved, seek to try to decide the issues solely on the basis of the law and the evidence and we must not be swayed by the persons involved or the tragedy of the circumstances that have brought about such accidents. In our state every plaintiff has the burden of proving his case by a preponderance of the evidence. Liability is limited to those whose fault and negligence has brought about an accident, and even though the five persons who might have been witnesses in the case had they lived, can shed no light upon the facts of this case, we cannot thereby eliminate the responsibility of their heirs and legal representatives of proving that the death of their loved ones came about as the result of negligence of Isaac Norrell. After reviewing fully, as I have said, all of the testimony in the case, including the testimony of the eminent experts, Dr. Tonn and Dr. Ruff, and the testimony of the witnesses on behalf of the defendant, and after looking at the physical facts involved in the case, this Court cannot reach any other conclusion except that the plaintiffs have failed to prove their case by a preponderance of the evidence and, therefore, there must be judgment in this case rejecting their demands in each of the cases at their cost.”
On this appeal counsel for appellants assert that the trial court erred: (1) in not applying the principle of law that where a motor vehicle comes to rest on the wrong side of the road, a presumption is raised that it was upon its wrong side of the road at the time of the collision and that the effect of this principle of law is to place upon the defendants the burden of proving that the motor vehicle got there without negligence on the part of its driver; (2) in not holding that the location of the debris as well as the position of the two vehicles immediately following the accident showed that the collision occurred in the Holder’s vehicle’s lane and shifted to defendants the burden of proving freedom of negligence ; (3) in failing to hold that the physical evidence and Newton’s laws of motion clearly prove that the collision resulted from the trailer of the Wheeling vehicle entering its lefthand traffic lane due to improper operation of the Wheeling driver; and (4) in refusing to grant a new trial for the purpose of taking the testimony of Alvin Doyle.
The errors so charged are discussed seriatum. (1) The first specification of error may be disposed of briefly. As a condition precedent to the application of the principle of law stated in Travelers Fire Insurance Company v. Meadows, La.App., 13 So.2d 537 (1st Cir. 1943) the party invoking the rule must establish by a preponderance of the evidence that the vehicle in question was in fact on the wrong side of the road at the moment of collision. The able analysis by the trial judge refutes the charge that the Wheeling vehicle was outside of its lane of travel at the moment of impact. (2) The second assignment of error fails for the same reason as did the first. Although there was more debris found in the Holders’ lane, the explanation of and findings by the trial judge with respect to this point dispose of it. (3) The third error charged rests upon the failure of the trial judge to apply Newton’s Laws of Motion. This court, as was the trial court, was obliged to weigh the theoretical opinions of Drs. Tonn and Ruff against the eye witness testimony of Norrell, Trooper Thompson and Walter Savage, Jr. The trial court found the latter witnesses credible and accepted their testimony. We approve that decision for we believe the testimony of these witnesses accurately portrays just what took place. (4) In a final assignment of error appellants complain that the court erred in refusing to grant a new trial for the purpose of taking the testimony of Alvin Doyle. We find no merit in the appellants’ contention. The plaintiffs were not entitled to a new trial *304 as a matter of right. Article 1972 of the LSA-Code of Civil Procedure. In their motion for a new trial counsel for mover asserted:
“Near the close of plaintiff’s case in chief, Mr. Doyle being still unavailable, plaintiff’s counsel requested that the case be held open for the purpose of taking testimony, but upon defendants’ insistence that plaintiff rest, or that the entire case be continued, plaintiff’s counsel firmly believing, as they do now, that they had borne the required burden of proof in the circumstances, reluctantly closed their case in chief without the evidence of the expert originally intended as their principal witness.”
Manifestly, counsel abandoned the right to call the witness of whose absence they now complain. It is indicated in the record that Mr. Doyle’s testimony was that of an expert in the related fields which appear to us to have been fully covered by Drs. Ruff and Tonn. It was entirely discretionary with the trial judge as to whether a new trial should have been granted. Article 1973 of the LSA-Code of Civil Procedure.
The defendants have filed a plea of prescription alleging that the claims of Robert Holder have prescribed or perempted by the elapse of one year; that Robert Holder had a period of one year from December 10, 1960 in which to institute suit against the defendants, or alternatively he had a period of one year from December 14, 1960, in which to institute suit and legally appear as proper person as party plaintiff; and in the further alternative, defendants aver that when Robert Holder became twenty-one years of age on December 16, 1960, he had one year from that date in which to be substituted as party plaintiff and to be able to legally appear as a party plaintiff, and that Robert Holder made no effort to be made a party plaintiff in proper person until September 24, 1962, when a motion and order for Robert Holder to be recognized as a plaintiff and substituted as a party plaintiff were offered for filing. The plea of prescription is predicated upon the alleged invalidity of the initial appointment of Milton C. Trichel, Jr. as tutor ad hoc for Robert Holder. In view of the disposition this court has made of the case upon its merits, it is unnecessary to pass upon the plea of prescription.
We are prompted to comment that we are indebted for the painstaking and careful review of the evidence and issues in the case by the learned trial judge, and for excellent briefs filed for all litigants. These have been of great assistance to this court. After carefully weighing the evidence and issues presented by the record we hold that the case was properly decided by the trial court and accordingly, the judgment is affirmed at appellant’s cost.